1
2
3
4
5
6
7

8
9

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

10

11   MARK A. GIES,

12           Plaintiff,

13   v.

14   CAROLYN W. COLVIN,
     Acting Commissioner of Social Security,

15

16           Defendant.

)   Case No.: 1:15-cv-0922-JLT
)
)   ORDER DIRECTING ENTRY OF JUDGMENT IN
)   FAVOR OF DEFENDANT CAROLYN COLVIN,
)   ACTING COMMISSIONER OF SOCIAL
)   SECURITY AND AGAINST PLAINTIFF MARK
)   GIES
)
)
)
)
)

17           Mark Gies asserts he is entitled to supplemental security income under Title XVI of the Social

18   Security Act.  Plaintiff argues the administrative law judge erred in evaluating the record and seeks

19   judicial review of the decision to deny benefits.  Because the decision of the ALJ is supported by

20   substantial evidence and the record and any error by the ALJ was harmless, the decision to deny

21   Plaintiff's application for benefits is **AFFIRMED**.

22                                    **PROCEDURAL HISTORY**

23           On October 14, 2011, Plaintiff filed his application for benefits, alleging disability beginning on

24   January 1, 2011.  (Doc. 10-6 at 2)  The Social Security Administration denied his application "initially

25   on April 5, 2012, and upon reconsideration on November 30, 2012." (Doc. 10-3 at 12)  After Plaintiff

26   requested a hearing, he testified before ALJ on February 12, 2014.  (*Id.*)  The ALJ found Plaintiff was

27   not disabled under the Social Security Act, and issued an order denying his application for benefits on

28   February 20, 2014.  (*Id.* at 9-21)  The ALJ's determination became the final decision of the

1   Commissioner of Social Security ("Commissioner") when the Appeals Council denied Plaintiff's

2   request for review on April 13, 2015.  (*Id*. at 2)

3   **STANDARD OF REVIEW**

4   District courts have a limited scope of judicial review for disability claims after a decision by

5   the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact,

6   such as whether a claimant was disabled, the Court must determine whether the Commissioner's

7   decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The

8   ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal

9   standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of*

10  *Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

11  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

12  reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.

13  389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

14  must be considered, because "[t]he court must consider both evidence that supports and evidence that

15  detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

16  **DISABILITY BENEFITS**

17  To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to

18  engage in substantial gainful activity due to a medically determinable physical or mental impairment

19  that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

20  § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

21  his physical or mental impairment or impairments are of such severity that he is not only
    unable to do his previous work, but cannot, considering his age, education, and work
22  experience, engage in any other kind of substantial gainful work which exists in the
    national economy, regardless of whether such work exists in the immediate area in which
23  he lives, or whether a specific job vacancy exists for him, or whether he would be hired if
    he applied for work.
24

25  42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

26  *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

27  the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

28  gainful employment.  *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

The Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**

In December 2010, Plaintiff visited Northwest Medical Group, reporting he had a cough, congestion, and sore throat.  (Doc. 10-8 at 10)  Dr. Naralya Malley observed that Plaintiff was "nasally contested."  (*Id.*)  Upon examination, she determined Plaintiff's "[e]xternal ear exam [was] normal," his ear canals were "unremarkable," and his "[h]earing [was] grossly normal."  (*Id.*)

On June 9, 2011, Plaintiff returned to Northwest Medical Group, reporting he had been "sick to the stomach" in the mornings for two weeks and he had "no appetite."  (Doc. 10-8 at 8)  Plaintiff told Dr. Malley that his "hands [were] cold and sweaty" in the morning, and he was "not sleeping well."  (*Id.*)  He also said his mouth was "dry" and he felt dehydrated.  (*Id.*)  Plaintiff said a psychiatrist prescribed for Klonopin, but it was "not working."  (*Id.*)  Dr. Malley observed that Plaintiff had a "[t]hin body habitus" and appeared "[i]n moderate distress, very anxious."  (*Id.*)  She noted Plaintiff had a gastrointestinal workup by Dr. Froese in 2004, but "refused any further [workup]," and his "labs in 12/10 [were] all normal."  (*Id.*)  Dr. Malley diagnosed Plaintiff with "generalized anxiety disorder-chronic, severe, not controlled" and irritable bowel syndrome, "chronic for years." (*Id.* at 8-9, emphasis omitted)  She gave Plaintiff samples of Prilosec and Bentyl to use as needed.  (*Id.* at 9)

In September 2011, Plaintiff reported the Prilosec and Bentyl were "ineffective."  (Doc. 10-8 at 16.)  Plaintiff said he had chest pain that felt like an "energy surge," he was losing weight, his hands and feet were "cold [and] sweaty," and he felt restless.  (*Id.*)  He described a "sharp transient pain from groin to rectum," and complained of frequently having to use the restroom and not feeling as though

his bladder emptied.  (*Id.*)  Dr. Froese ordered testing, including a comprehensive metabolic panel, complete blood count, and thyroid functioning (*id.* at 17-18), which yielded "normal" results.  (*Id.* at 16)  Less than a week later, Plaintiff reported his appetite was "slightly better," and he had gained 1lb. (*Id.* at 16)  Dr. Froese recommended that Plaintiff have an esophagogastroduodenoscopy with small bowel biopsy, which Plaintiff said was "not feasible" at that time.  (*Id.*)  Dr. Froese advised Plaintiff "to call if [he] want[ed] to proceed."  (*Id.*)

In October and November 2011, Plaintiff attended therapy sessions with Dr. John Middleton. (Doc. 10-8 at 26-30)  In October, on a scale of 0-10, with 10 being "the most intense feeling/ experience [he] could imagine," Plaintiff indicated his depression was 8, anxiety was 9, feelings of paranoia and suspiciousness were 5, his insomnia was 6/7, and irritation/anger was 7/8.  (*Id.* at 29)  He did not believe his medications were helping.  (*Id.* at 29, 30)  Dr. Middleton diagnosed Plaintiff with generalized anxiety disorder and panic disorder, and increased his dosage of Klonopin.  (*Id.* at 30) The next month, Plaintiff reported an increase in his depression, anxiety, insomnia, irritation, and anger, indicating each was a 9 or 10 on the same scale.  (*Id.* at 26)  Plaintiff did not indicate on the form whether he was taking his medication as prescribed, but he was "off Klonopin."  (*Id.* at 26-27)  On November 22, Dr. Middleton opined Plaintiff was "not stable" and diagnosed him with major depressive disorder (MDD) and panic disorder.  (*Id.* at 27)

In December 2011, Plaintiff told Dr. Malley that he wanted to see a neurologist "for multiple symptoms over the years," which he described as "shaking, flashing, [and] 'jolts in head.'"  (Doc. 10-8 at 33)  Plaintiff said he stopped all his psychiatric medication because they were "not working any more" and started on Neurontin, which he said was "not working either."  (*Id.*)  Dr. Malley noted Plaintiff had "become angry at times," which was a "new symptom."  She observed that Plaintiff appeared anxious, and his speech was "rapid and/or pressured."  (*Id.*)  She noted Plaintiff had "chronic severe IBS symptoms," which were treated by Dr. Froese, and Plaintiff's liver function test was "normal."  (*Id.*)

Dr. George Siu performed a neurological examination on January 30, 2012.  (Doc. 10-8 at 35) Dr. Siu noted that Plaintiff described "progressive loss of interest, personality change, periods of confusion, lacking emotion, having trouble sleeping or getting back to sleep when he awakens, lack of

energy and irritable bowel syndrome." (*Id.*)  In addition, Dr. Sui noted:

> In the last year or two he has become very restless, can pace incessantly and may feel generally weak.  There have been occasions in which he felt like he might pass out, and one instance his mother noted he was very pale.  He has never actually lost consciousness.
>
> In the past year he has had "surges" which he has difficulty describing, but it is like a lightening bolt or electric surge starting in his head and between his ears extending down to his chest.  This always occurs when he is lying down to get sleep, and recurs repeatedly until he gets to sleep.  This does not occur during waking hours.
>
> About four years ago he suddenly developed left sensorineural hearing loss for which an ENT could find no source.  He had had head trauma 3x on the top of his head in succession without LOC about three months prior to that.
>
> He denies headaches, cranial nerve symptoms, gait disorder, incoordination, weakness, numbness, paresthesias or sphincter dysfunction.  He has never had seizures.

(*Id.*)  Dr. Sui opined that the review of symptoms was "mostly negative except for tinnitus, hearing loss, occasional chest pain, dyspnea and IBS." (*Id.* at 36)  Dr. Sui believed Plaintiff's "history and symptoms [were] consistent with depression or bipolar disorder," and that the "surges" Plaintiff described "could possibly be a form of seizures."  (*Id.*)  Dr. Sui opined vitamin B-12 and folic acid deficiency could be a possible source, and discussed Plaintiff "undergoing vitamin B-12, folic acid, methyl malonic acid, EEG and MRI brain testing." (*Id.*)  Plaintiff said "[h]e, his mother, and brother [would] discuss this, and let [Dr. Sui] know their decision." (*Id.*)  Dr. Sui concluded that Lithium "could also be another medication [for Plaintiff] to try." (*Id.* at 37)

On February 6, 2012, Plaintiff went to an emergency room, complaining of anxiety.  (Doc. 10-8 at 46)  Plaintiff's brother reported that Plaintiff had a "violent outburst" the day before, during which he "hit a CD player." (*Id.*)  Dr. John Vajner III noted Plaintiff was "hesitant to seek help, [did] not like taking medications, and he seem[ed] determined to find a medical cause for his symptoms." (*Id.*)  Dr. Vajner believed Plaintiff suffered from panic attacks, anxiety disorder, and an anger problem. (*Id.* at 47)  He counseled Plaintiff and his family regarding the diagnosis, and noted that Plaintiff was "counseled extensively about [his] need for psychiatric continuity of care." (*Id.*)

The next day, Plaintiff sought treatment with Fresno County Mental Health and had an initial evaluation with Alexander Betancourt, SLMFT.  (*See* Doc. 10-8 at 80-86)  Plaintiff reported he was "anxious and depressed daily for most of the day for at least 10 years." (*Id.* at 80)  Mr. Betancourt

noted Plaintiff said he was not in special education and had a high school education.  (*Id.* at 81)  Also, Plaintiff told Mr. Betancourt that he "ha[d] not worked since 1990 due to his anxiety, anger and depression."  (*Id.* at 82)  Plaintiff said he took psychiatric medication but stopped because it did not work, and he stopped seeing Dr. Middleton because he could not afford it.  (*Id.*)  Mr. Betancourt recommended Plaintiff attend both individual and group therapy. (*Id.* at 80)

Dr. Roger Wagner performed "a comprehensive internal medicine evaluation" on February 20, 2012.  (Doc. 10-8 at 50-54)  Plaintiff said he "was having tinnitus and then had acute hearing loss over one night."  (*Id.*)  He told Dr. Wagner that he "ha[d] no problems with one-on-one conversations," though he had "some problems in crowds if people [were] on his left side."  (*Id.*)  Plaintiff also said he had "some vertigo," which was "primarily positional" and occurred "occasionally."  (*Id.*)  He said he was able to cook; drive; shop; do chores such as cleaning, laundry, vacuuming, mowing the yard, and raking the yard; and exercise by walking and biking.  (*Id.* at 50-51)  Dr. Wagner determined Plaintiff's strength was "5/5" in his arms and legs, "including grip strength."  (*Id.* at 53)  According to Dr. Wagner, Plaintiff "did not appear to have any vertigo upon lying down and rising from supine straight leg raise."  (*Id.*)  He diagnosed Plaintiff with hearing loss and opined Plaintiff "should not work around excessive noise given the hearing loss."  (*Id.*)  Dr. Wagner opined Plaintiff "should avoid climbing or balancing [on] ladders or scaffolds given the vertigo."  (*Id.*)  Plaintiff had no other limitations.  (*Id.*)

Dr. Lance Portnoff conducted "a comprehensive psychiatric evaluation" on February 26, 2012.  (Doc. 10-8 at 57- 61)  Plaintiff told Dr. Portnoff that he "was bullied as a child for years, subjected to physical and verbal abuse," and "witnessed domestic violence."  (*Id.* at 57)  Plaintiff stated he felt "anxious all of his life, [and] uncomfortable around people, especially large groups."  (*Id.*)  Also, Plaintiff said he felt "tense and angry all the time" and had "uncued panic attacks about once a week."  (*Id.*)  Dr. Portnoff noted Plaintiff described "some OCD symptoms relative to symmetry and mild cleanliness, but denie[d] any counting or checking compulsions."  (*Id.* at 58)  Plaintiff told Dr. Portnoff that he had "irritable bowel syndrome, but [it was] currently under control."  (*Id.*)  Dr. Portnoff noted Plaintiff reported he was "schooled in special education classes throughout elementary and high school," and had "a history of childhood ADHD… and learning disabilities."  (*Id.*)  Plaintiff said he worked as a general laborer but stopped "because he was having angry outbursts due to frustration."

(*Id.*)  Dr. Portnoff observed that Plaintiff's thought process was "moderately rambling."  (*Id.* at 59)
However, Plaintiff "demonstrate[d] adequate concentration, persistence, and pace." (*Id.* at 58)  Dr.
Portnoff opined that Plaintiff's immediate, recent, and past memory were intact because he was able to
recall three words immediately and again after several minutes, and "remember autobiographical
information." (*Id.* at 59)  Dr. Portnoff concluded Plaintiff had "no limitations in his ability to perform
detailed and complex tasks," and was "able to perform simple and repetitive tasks." (*Id.* at 60)  He
believed Plaintiff had "mild limitations" with "his ability to work on a consistent basis without special
or additional instruction due to problems" and "to maintain regular attendance." (*Id.* at 61)  Further,
Dr. Portnoff believed Plaintiff's "ability to deal with the stress encountered in a competitive work
environment [was] moderately impaired due to depression and PTSD." (*Id.*)

Dr. Ramon Raypon, from Fresno Behavior Health, began treating Plaintiff in May 2012, and
saw him every eight weeks.  (Doc. 10-8 at 92; Doc. 10-9 at 13)  He completed a "Short-Form
Evaluation for Mental Disorders" on October 10, 2012.  (Doc. 10-8 at 92-95)  Dr. Raypon noted
Plaintiff did not exhibit any behavioral disturbance, such as aggression or violence, though he had a
depressed mood.  (*Id.* at 92-93)  Dr. Raypon believed that Plaintiff's concentration was intact, memory
was normal, and intelligence was average.  (*Id.* at 93)  According to Dr. Raypon, Plaintiff had an
unlimited ability to understand, remember, and carry out both simple and complex instructions.  (*Id.* at
95)  In addition, Dr. Raypon indicated Plaintiff had a fair ability to perform activities within a schedule
and maintain regular attendance, complete a normal workday and workweek, and respond to changes in
the work setting.  (*Id.*)

On November 15, 2012, Dr. Pong reviewed the medical record and completed a case analysis.
(Doc. 10-4 at 32)  Dr. Pong noted that though Plaintiff alleged he had vertigo, he did not receive "any
medications or significant [treatment] for this," and there was "no evidence of dizziness during the
[consultative examination." (*Id.*)  Dr. Pong concluded that "all in all- no physical limitation [was]
established." (*Id.*, emphasis omitted)  Therefore, Dr. Pong opined Plaintiff's physical impairments
were "nonsevere." (*Id.*)

Dr. Raypon completed a second questionnaire on January 23, 2014.  (Doc. 10-9 at 12-3)  He
noted Plaintiff had a history of "anxiety, panic attacks, [and] depression," and was diagnosed with

"major depressive disorder." (*Id.*)  According to Dr. Raypon, Plaintiff did not have hallucinations, confusion, mood swings, catatonic or disorganized behavior, or other disorganization of thought. (*Id.*) Although Dr. Raypon believed Plaintiff had an abnormal level of social isolation, he did not believe this was a severe impairment that would "impair the [plaintiff's] ability to perform full-time work, week after week." (*Id.*)

**B.    Administrative Hearing Brief**

Before the administrative hearing, Plaintiff's counsel, Jonathan Peña from the Law Office of Melissa Proudain, filed a hearing brief with the ALJ. (Doc. 10-7 at 72-74)  Mr. Peña identified the severe impairments in issue as "generalized anxiety disorder;" "major depressive disorder, recurrent, severe without psychotic features;" "obsessive compulsive disorder;" irritable bowel syndrome-chronic;" and "hearing loss with associated vertigo." (*Id.* at 72-73)  Mr. Peña noted Plaintiff "does not contend a listing is met" at step three of the evaluation, and that he had no past relevant work to be evaluated at step four. (*Id.* at 73)  Mr. Peña focused on the issues at step five, asserting Plaintiff was unable to perform work "due to a combination of his physical and mental impairments." (*Id.*)

**C.    Administrative Hearing Testimony**

Plaintiff testified under oath before an ALJ on February 12, 2014. (Doc. 10-3 at 32)  Plaintiff said he had a high school education and was not in Special Education classes. (*Id.* at 34)  However, he reported that while in junior high, he was "put…aside, at one point, to teach [him] one on one." (*Id.*) Plaintiff reported he did not attend college or receive vocational training. (*Id.*)

He said that in 1990, he tried to work but "only lasted about two weeks" because "the anxiety, and the pressure… was just overwhelming." (Doc. 10-3 at 35)  Plaintiff believed that he had "gotten worse" since that time, and in the past fifteen years, he had not worked or looked for work. (*Id.* at 34-35)  He reported that he did "some help for the family," such as if they "needed some chores done," but had stopped assisting his relatives other than his mother, with whom he lived. (*Id.* at 33, 34)  Plaintiff said he drove his mother to doctor appointments "maybe three times a week." (*Id.* at 33)  He also said he did chores "for his mom," such as "[c]leaning the bathrooms, washing the floors -- mopping the floors, vacuuming, dusting," and yard work. (*Id.* at 41)

Plaintiff reported that he had not looked for a job because he suffered from irritable bowel

syndrome which was "kind of embarrassing," and "just gets to the point where [he] need[ed] to have a restroom, immediately." (Doc. 10-3 at 35)  He said that when going to the hearing, he "had to use the restroom . . . because he knew about the situation," and "usually just can't handle it." (*Id.* at 36)

He testified he saw a psychiatrist, Dr. Raypon, "[a]bout once every three months," and was taking Abilify and sertraline for depression and anxiety. (Doc. 10-3 at 36-37)  Plaintiff believed the medicine helped his depression "a tiny bit." (*Id.* at 38)  However, he said it did not help ease his anxiety, and he still had "extreme nervousness." (*Id.* at 37)  Plaintiff stated that when things became overwhelming and he was nervous, "all that affect[ed] [his] IBS" and caused him "to use the restroom several times." (*Id.* at 38)  He said he was not being treated for IBS, and could not afford an endoscopy or colonoscopy. (*Id.* at 46)

He reported that he also had difficulty with his ears, including tinnitus in both hears and hearing loss in his left ear. (Doc. 10-3 at 47)  Plaintiff said the tinnitus "drives you …mad a little bit." (*Id.*)  He believed he had lost "two-third of [his] hearing" in that ear, and his tinnitus was "louder in the left ear than… in the right." (*Id.*)  Plaintiff said he also had symptoms of dizziness or vertigo. (*Id.* at 48)  Plaintiff explained he did not wear a hearing aid because he did not have the money to get one, and his mother "ha[d] so much trouble with them." (*Id.* at 47)

Plaintiff estimated he was able to chores and concentrate for an "hour and a half," after which he was "usually pretty exhausted." (Doc. 10-3 at 41)  He said he "used to read a lot," but no longer did so because his mind wandered and he could not "keep [his] concentration on the book." (*Id.* at 41-42)  Plaintiff believed that he could read for "[r]oughly 20 minutes to a half hour" and maintain his concentration, after which he would need a break for "a couple of hours" before he continued reading. (*Id.* at 42)

He reported he had a computer and would browse the internet for "[t]here to four hours" at one time, "four or five days out of the week." (Doc. 10-3 at 44)  He said during that time he would "check with friends and family" and read about the weather. (*Id.*)  Plaintiff stated he stayed at the computer for about a "half hour, 45 minutes" and then would take a break. (*Id.* at 45)

Vocational expert Judith Najarian (the "VE") testified after Plaintiff at the hearing.  The ALJ asked the VE to "[a]ssume an individual of the same age, education, and past work" as Plaintiff,

"possessing the residual functional capacity to perform work at all exertional levels, except work is limited to simple, routine, repetitive tasks." (Doc. 10-3 at 49) The VE opined such a person could perform the "full range of unskilled work." (*Id.*) For example, the VE identified the positions of a machine cleaner, DOT 699.687-014; equipment cleaner; DOT 599.684-010; and marker; DOT 209.587-034.[1] (*Id.* at 49-50)

Next, the ALJ asked the VE to consider "the additional limitation … of only occasional interaction with the public and with co-workers." (Doc. 10-3 at 50) The VE opined each of the three jobs identified "would still work" because the equipment cleaner and machine cleaner did not interact with the public and were "after hours." (*Id.*) In addition, the VE believed the marker position—which involved putting prices on items—"would still work with occasional" interactions. (*Id.*) Thus, there would not be a reduction in the number of jobs available. (*Id.* at 50-51) Even if the person could interact only "occasionally" with supervisors, the VE opined the same jobs would apply, without a reduction. (*Id.*)

Fourth, the ALJ asked the VE to "add all of the limitations in the previous hypotheticals and include, cannot sustain sufficient concentration, persistence, or pace for an eight-hour day work schedule." (Doc. 10-3 at 51) The VE opined there were no jobs such a person could perform in either the local or national economy. (*Id.*)

Fifth, the ALJ asked the VE to consider the same limitations "as hypo number three and add -- never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, crouch, kneel or crawl; avoid concentrated exposure to excessive vibration and to unprotected heights." (Doc. 10-3 at 52-53) The VE testified that the machine cleaner and equipment cleaner positions would be excluded with these limitations, but the marker position remained in with "no reduction in [the] numbers" of jobs available. (*Id.* at 53) Further, the VE opined the individual could perform other jobs such as mail sorter or clerk, DOT 209.687-026, and assembler of cutlery, DOT 701.687-010. (*Id.* at 53-54)

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

1    **D.    The ALJ's Findings**

2            Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

3    gainful activity after the application date of September 21, 2011.  (Doc. 10-3 at 14)  At step two, the

4    ALJ found Plaintiff's severe impairments included: "major depressive disorder, recurrent, severe,

5    without psychotic features; bipolar disorder; generalized anxiety disorder, not otherwise specified;

6    obsessive-compulsive disorder; and post-traumatic stress disorder."  (*Id.*)  At step three, the ALJ

7    determined Plaintiff did not have an impairment, or combination of impairments, that met or medically

8    equaled the criteria of a listed impairment.  (*Id.* at 14-16)  Next, the ALJ determined:

9    > [T]he claimant has the residual functional capacity to perform the full range of light
     > work at all exertional levels.  The claimant is able to perform simple, routine and
10   > repetitive tasks, with occasional interaction with the public, and with coworkers.  The
     > claimant is able to work around supervisors throughout the day, but is limited to only
11   > occasional interaction with them.

12   (*Id.* at 16)  Based upon this RFC, the ALJ concluded "there are jobs that exist in significant numbers

13   in the national economy that the [plaintiff] can perform," such as machine cleaner, equipment cleaner,

14   and marker.  (*Id.* at 20)  Consequently, the ALJ found Plaintiff was not disabled as defined by the

15   Social Security Act.  (*Id.* at 21)

16                                    **DISCUSSION AND ANALYSIS**

17            Plaintiff contends the ALJ erred in finding his impairments do not satisfy a Listing at step three,

18   determining the residual functional capacity, disregarding Plaintiff's symptom testimony, and

19   questioning the vocational expert.  (*See* Doc. 16 at 12-18) Therefore, Plaintiff asserts the matter should

20   be remanded for a calculation of benefits.  (*Id.* at 18-20)  On the other hand, Defendant argues that

21   "[t]he ALJ did not commit reversible error in her decision," and the decision is supported by substantial

22   evidence in the record.  (Doc. 18 at 11, *see also id.* at 2-9)

23   **A.    The ALJ's Step Three Findings**

24            The Listings set forth by the Commissioner "define impairments that would prevent an adult,

25   regardless of his age, education, or work experience, from performing any gainful activity, not just

26   'substantial gainful activity.'"  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis

27   in original).  At step three of the sequential evaluation, the claimant bears the burden of demonstrating

28   her impairments equal a listed impairment.  *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987); 20

                                                    11

1    C.F.R. §§ 404.1520(d), 416.920(d).  "If the impairment meets or equals a listed impairment, the

2    claimant is conclusively presumed to be disabled.  If the impairment is not one that is conclusively

3    presumed to be disabling, the evaluation proceeds to the fourth step."  *Bowen*, 482 U.S. at 141; *Tackett*

4    *v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

5        Plaintiff contends, "The ALJ erred in her analysis of whether [Plaintiff's] physical and mental

6    impairments meet or equal a Listing."  (Doc. 16 at 12, emphasis omitted)  Plaintiff argues that the ALJ

7    failed to "adequately explain . . . her evaluation" or support the conclusion that Plaintiff does not meet

8    the requirements of the listings with citations to the medical record.  (*Id.* at 13-14, citing *Marcia v.*

9    *Sullivan*, 900 F. 2d 172, 176 (9th Cir. 1990))

10       Significantly, during the administrative proceedings Plaintiff did not argue that he met or

11   medically equaled any listing.  To the contrary, Mr. Peña asserted in his hearing brief that Plaintiff

12   "**does not contend a listing is met**" at step three.[2]  (Doc. 10-7 at 73, emphasis in original)  Thus, Mr.

13   Peña did not identify any evidence to support a contention that Plaintiff's impairments satisfied the

14   requirements of any listings.  (*See id.*)  Instead, Mr. Pena focused solely on step five of the evaluation,

15   asserting Plaintiff was incapable of performing work in either the regional or national economies "due

16   to a combination of his physical and mental impairments."  (*Id.*)

17       Notwithstanding this prior assertion that he did not meet a listing, Plaintiff—now represented by

18   another attorney from the same law firm—asserts the ALJ erred by not articulating specific reasons to

19   support her finding that Plaintiff "does not have an impairment or combination of impairments that

20   meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

21   Appendix 1."  (*See* Doc. 10-3 at 14)  Because the ALJ did not identify specific evidence to support her

22   conclusion as part of the step three determination, Plaintiff's counsel argues this fails to meet the

23   standard articulated by the Ninth Circuit in *Marcia,* in which the Court indicated: "[I]n determining

24

25   ───────────────

     [2] The doctrine of "invited error" has been applied in social security cases and the Court finds no reason that it should not

26   apply here. "When a party "has both invited the error, and relinquished a known right, then the error is waived and
     therefore unreviewable." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir.1997) (en banc). "The invited error doctrine

27   holds that '[O]ne may not complain on review of errors below for which he is responsible'." *Sovak v. Chugai Pharm. Co.*,
     280 F.3d 1266, 1270 (9th Cir.2002) (quoting *Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1336–37 (9th

28   Cir.1985)); see also *Johnson v. Immigration & Naturalization Serv.*, 971 F.2d 340, 343–44 (9th Cir.1992) (applying invited
     error doctrine in context of review of administrative decision)." *Williams v. Astrue*, 2011 WL 1059124, at *3 (D. Or. Mar.
     21, 2011), aff'd sub nom. *Williams v. Comm'r of Soc. Sec. Admin.*, 494 F. App'x 766 (9th Cir. 2012)

whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments." (Doc. 16 at 13, quoting *Marcia*, 900 F.2d at 176)  However, the Court determined also that an ALJ is not required to state why a claimant fails to satisfy every section of a listing, as long as the ALJ adequately summarizes and evaluates the medical evidence.  *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001).  The Court explained: "*Marcia* simply requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading 'Findings.'" *Id.*  Here, the ALJ carried the burden to address the medical evidence as required, which supports the determination that Plaintiff does not satisfy the listings.

Moreover, "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  Review of the hearing brief (Doc. 10-7 at 73) and the administrative hearing at which Plaintiff's counsel "close[d] on the brief" (Doc. 10-3 at 55), clearly shows Plaintiff did not present any evidence "to establish equivalence" during the proceedings before the ALJ.  Under such circumstances, the Ninth Circuit concluded that "the ALJ did not need to explain [the] conclusion." *See Pruitt v. Comm'r of Soc. Sec.,* 612 Fed. Appx. 891, 894 (9th Cir. 2015) (finding that where the claimant "failed to present a theory to the ALJ as to how her combined impairments meet or equal [a listing]," the ALJ was not required to explain his conclusion).  Because Plaintiff did not present any evidence at the administrative level that his impairments met or equaled a listing, the ALJ did not err by not identifying specific evidence to support her conclusion at step three.

**B.     Plaintiff's Residual Functional Capacity**

A claimant's residual functional capacity ("RFC") is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs").  In formulating a RFC, the ALJ weighs medical and other source opinions, as well as the claimant's credibility.  *See, e.g., Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009).  Further, the ALJ must

13

consider "all of [a claimant's] medically determinable impairments"—whether severe or not—when

assessing a RFC.  20 C.F.R. §§ 405.1545(a)(2), 416.945(a)(2).

Plaintiff contends the ALJ "failed to account for" his "hearing loss with associated vertigo" and

irritable bowel syndrome ("IBS") in the RFC.  (Doc. 16 at 17)  Plaintiff observes that Dr. Wagner

"opined that [Plaintiff] should not work around excessive noise and required postural limitations due to

the hearing loss and associated vertigo."  (*Id.* at 17)  Plaintiff argues the ALJ improperly rejected this

opinion, as well as the diagnosis from a treating physician that he suffers from tinnitus and hearing loss.

(*Id.* at 17-18)  Further, Plaintiff observes that he testified his IBS "symptoms increase" "[w]hen around

people or when in stressful situations."  (*Id.* at 17)  According to Plaintiff, "[t]hese impairments

significantly impact a typical work-day and the types of work performed," and "[t]he ALJ erred in not

including these limitations in her assessment of [Plaintiff's] residual functional capacity."  (*Id.* at 18)

1.     Physical limitations

a.     IBS

As noted, Plaintiff contends the ALJ failed to account for his IBS in the residual functional

capacity.  However, Plaintiff only notes that he was diagnosed with and treated for IBS, and does not

identify any work limitations related to IBS in the record.  Indeed, even when Plaintiff was evaluated

by the consultative examiner, Dr. Wagner, he did not report any difficulties with IBS, and focused upon

"[l]eft ear hearing with vertigo."  (*See* Doc. 10-8 at 50)

The Ninth Circuit has determined "[t]he mere existence of an impairment is insufficient proof

of a disability." *Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993). Accordingly, this Court explained:

"A mere recitation of a medical diagnosis does not demonstrate how that condition impacts plaintiff's

ability to engage in basic work activities. Put another way, a medical diagnosis does not an impairment

make." *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011); *Huynh v.

Astrue*, 2009 U.S. Dist. LEXIS 91015, at *6 (E.D. Cal. Sept. 30, 2009). Rather, for an impairment to be

"severe," it must significantly limit the claimant's physical or mental ability to do basic work activities,

or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1520(c), 416.920(c),

416.921(b).  Because no doctor identified physical limitations caused by IBS, the ALJ did not err in

evaluating the RFC related this diagnosis.

1

    *b.*    *"Opinions" of treating physicians regarding hearing loss*

2        As an initial matter, Plaintiff contends the ALJ "erred by improperly disregarding the opinions

3 of treating physicians regarding [his] hearing loss." (Doc. 16 at 15, emphasis omitted)  He argues that

4 the ALJ "ignores the evidence presented by Mr. Gies of having been diagnosed with hearing loss and

5 tinnitus by his treating physician." (*Id.*, emphasis omitted)  Plaintiff asserts, "Similarly ignored are

6 medical records describing Mr. Gies as being "very sensitive to noise" and "unable to tolerate noise.""

7 (*Id.* at 16, citing AR 365, 367 [Doc. 10-8 at 72, 74])  Plaintiff argues the "failure to recognize and

8 address the treating physician's opinions with respect to Mr. Gies' hearing loss constitutes error." (*Id.*)

9        Significantly, however, Plaintiff fails to identify any opinion by a treating physician regarding

10 Plaintiff's hearing loss.  Rather, Plaintiff only points to the *diagnosis* of hearing loss.[3]  The treatment

11 notes identified by Plaintiff show the doctors noted under "Subjective Findings" that *Plaintiff* "[s]poke

12 of being unable to tolerate noise and in the past couple of weeks he has been able to hear fights

13 between coupls (sic) in the neighborhood or other disturbance" and "noise got to him" in a store.  (Doc.

14 10-8 at 72)  Similarly, Plaintiff reported he was "still very sensitive to noise." (*Id.* at 74)  No treating

15 physician offered an *opinion* regarding Plaintiff's hearing loss as defined by the Regulations, which

16 indicates medical opinions are statements that "reflect[s] judgments about the nature and severity of

17 your impairment(s), including your symptoms, diagnosis, and prognosis, what you can do despite your

18 impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

19 Because the treating physicians did not offer any opinions regarding Plaintiff's hearing loss and

20 limitations it may cause, Plaintiff fails to show an error by the ALJ.

21

    *c.*    *Limitations imposed by Dr. Wagner*

22        As the ALJ observed, Dr. Wagner, a consultative examiner, diagnosed Plaintiff with hearing

23 loss, and opined Plaintiff "had no lifting, carrying, standing, walking or sitting limitations." (Doc. 10-3

24 at 17)  Also, Dr. Wagner opined Plaintiff "should avoid climbing or balancing on ladders or scaffolds,"

25 and "should not work around excessive noise." (*Id.*)  The ALJ indicated she gave "only some weight"

26 to the opinions of Dr. Wagner.  (*Id.* at 18)  Plaintiff contends the ALJ erred by rejecting the limitations

27

28            [3] The ALJ accepted that Plaintiff has hearing loss, but found it did not have more than a "minimal effect" on
Plaintiff's ability to work.  (*See* Doc. 10-3 at 14)

1    imposed by Dr. Wagner.  (Doc. 16 at 17-18)

2         A physician's opinion is not binding upon the ALJ and may be discounted whether another

3    physician contradicts it.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ may reject

4    an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear

5    and convincing" reasons.  *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996).  In contrast, a

6    *contradicted* opinion of a treating or examining professional may be rejected for "specific and

7    legitimate reasons that are supported by substantial evidence in the record."  *Id.*, 81 F.3d at 830.  When

8    there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the

9    conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict

10   must be upheld when there is "more than one rational interpretation of the evidence."  *Id.; see also*

11   *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("if the evidence can support either outcome,

12   the court may not substitute its judgment for that of the ALJ").  Here, the opinion of Dr. Pong—who

13   concluded Plaintiff did not establish any physical limitations—contradicted the opinion of Dr. Wagner.

14   Thus, the ALJ was required to identify specific and legitimate reasons for rejecting the limitations

15   imposed by Dr. Wagner.

16        The ALJ observed the limitations from Dr. Wagner were based upon "hearing loss and vertigo,"

17   and declined to include them in the decision.  (Doc. 10-3 at 18)  The ALJ noted that "Dr. Wagner

18   performed a detailed physical examination of the claimant" and found "no evidence that a hearing loss

19   was confirmed during the examination."  (*Id.*)  Further, the ALJ observed: "Although Dr. Wagner

20   stated the claimant had vertigo associated with his hearing loss, he said none was obvious during his

21   assessment."  (*Id.*)

22        Significantly, the Ninth Circuit determined an ALJ may reject the limitations imposed by a

23   physician when the ALJ explains why the opinion "did not mesh with [the physician's] objective data."

24   *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Similarly, an opinion may be rejected

25   where it offers "little in the way of clinical findings to support the conclusion." *Young v. Heckler*, 803

26   F.2d 963, 968 (9th Cir. 1986).  As the ALJ observed, Dr. Wagner noted Plaintiff "did not appear to

27   have any vertigo upon lying down and rising from supine straight leg raise."  (Doc. 10-8 at 43)  Also,

28   Dr. Wagner observed that Plaintiff "had no problems understanding" during the examination.  (*Id.* at

53)  Because the ALJ explained how she found no objective data or clinical findings by Dr. Wagner to support the limitations for hearing loss and vertigo, she did not err by rejecting the limitations.  *See Tommasetti*, 533 F.3d at 1041; *Young*, 803 F.2d at 968.

### 2.     Mental limitations

The ALJ concluded: "The claimant is able to perform simple, routine and repetitive tasks, with occasional interaction with the public, and with coworkers.  The claimant is able to work around supervisors throughout the day, but is limited to only occasional interaction with them."  (Doc. 10-3 at 16)  In making this finding, the ALJ observed that Dr. Raypon, Plaintiff's treating physician, concluded Plaintiff had a "good" ability "to maintain concentration, attention, and persistence," though his social functioning was "impaired."  (Doc. 10-3 at 18)  Similarly, the ALJ observed that Dr. Portnoff, the consultative examiner, "opined the claimant was capable of performing simple and repetitive tasks."  (*Id.* at 17)  In addition, the ALJ noted Dr. Portnoff found Plaintiff was "moderately limited in his ability to accept instructions from supervisors, and to interact with coworkers and the public."  (*Id.*)  The ALJ gave "great weight" to these opinions.  (*Id.*)

The Ninth Circuit determined the limitation to unskilled work adequately encompasses a claimant's "moderate mental residual functional capacity limitations."  *Thomas*, *Thomas v. Barnhart*, 278 F.3d 947, 953, 955 (9th Cir. 2002); *see also Stubbs-Danielson*, 539 F.3d 1169 (concluding the limitation to "simple, routine, repetitive" tasks accommodated the examining physician's findings that the claimant had "several moderate limitations").  Likewise, the Ninth Circuit concluded a limitation to simple tasks adequately encompasses moderate limitations with social functioning. *See Rogers v. Comm'r of Soc. Sec. Admin.*, 490 Fed. App'x. 15 (9th Cir. 2012) (holding that a residual functional capacity for simple routine tasks, which did not expressly note the claimant's moderate limitations in interacting with others, nonetheless adequately accounted for such limitations); *see also Langford v. Astrue*, 2008 WL 2073951 at *7 (E.D. Cal. May 14, 2008) ("unskilled work . . . accommodated [the claimant's] need for 'limited contact with others'").  Accordingly, the RFC adequately encompasses Plaintiff's mental limitations, and is supported by the opinions of Drs. Raypon and Portnoff.

### 3.     Plaintiff's symptom testimony and the RFC

According to Plaintiff, "the ALJ impermissibly disregarded [his] symptom testimony."  (Doc.

17

16 at 16)  Plaintiff observes that the ALJ's credibility determination was "limited to the following:

> I considered the claimant's allegations and complaints, and while sincere in his testimony, the evidence does not support a finding of disability.
>
> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."

(Doc. 16 at 16-17, quoting Doc. 10-3 at 19)  Plaintiff contends this analysis was "insufficient" because "[t]here is no discussion of what statements … are 'not entirely credible' or any explanation as to why." (*Id.* at 17)

In general, in assessing credibility, an ALJ must determine whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Here, the ALJ determined the medical record showed his "impairments could reasonably be expected to cause the alleged symptoms." (Doc. 10-3 at 19) The ALJ did not find Plaintiff lacked credibility, and instead found he was "sincere." (*Id.*)  Moreover, the RFC addressed many of the symptoms Plaintiff identified during the hearing.

Notably, Plaintiff does not identify any specific limitations to which he testified that the ALJ failed to adopt in her decision in attacking the ALJ's credibility finding.  (*See* Doc. 16 at 16-17) Nevertheless, in other sections of his opening brief, Plaintiff notes that he testified that his IBS symptoms increase "[w]hen around people or when in stressful situations." (Doc. 16 at 17)  Further, Plaintiff testified he had difficulty with concentration.  (Doc. 10-3 at 36)  Plaintiff fails to acknowledge these difficulties with stress, concentration, and being around others were addressed with the mental limitations identified in the RFC by the ALJ.

As explained above, the limitation to unskilled work encompasses moderate difficulties with mental limitations, including social interaction.  However, the Ninth Circuit determined that a limitation to unskilled work also addresses marked limitations with concentration "over extended periods of time."  *See, e.g., Thomas v. Barnhart*, 278 at 955-57 (emphasis added); *see also Sabin v. Astrue*, 337 Fed. App'x. 617, 620-21 (9th Cir. 2009) (finding the ALJ properly assessed medical evidence when finding that—despite moderate difficulties as to concentration, persistence, or pace—the

claimant could perform simple and repetitive tasks on a consistent basis).  Likewise, a limitation to simple tasks— as the ALJ identified here—addresses a claimant's low tolerance for stress.  *See, e.g., Keller v. Colvin,* 2014 WL 130493 at *3 (E.D. Cal. Jan. 13, 2014) (finding the ALJ "appropriately captured" the need for "low stress settings" by limiting the claimant to simple tasks, "equating to unskilled work").  Thus, the symptoms to which Plaintiff testified were encompassed within the RFC identified by the ALJ, and she did not err in considering his symptom testimony.

**C.     Vocational Expert Testimony**

When eliciting testimony from a vocational expert, the ALJ must set forth "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." *Tackett*, 180 F.3d at 1101 (quoting *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)).  Only limitations supported by substantial evidence must be included. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value."  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  When the "weight of the medical evidence supports the hypothetical questions posed," the ALJ's findings will be upheld by the court.  *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

Plaintiff contends the ALJ erred by relying upon the testimony of the vocational expert to find Plaintiff is able to perform work at step five of the evaluation, because "the ALJ's hypothetical upon which she relied did not include any reference to limitations associated with his irritable bowel disease or hearing loss with associated vertigo."  (Doc. 16 at 18)  However, as discussed above, the limitations in the hypothetical questions posed to the vocational expert —which mirrored the RFC—are supported by the record, including the opinions of Drs. Raypon, Wagner, Portnoff, and Pong.  Because the questions to the vocational expert included all of Plaintiff's impairments supported by substantial evidence in the record, the ALJ did not err in relying upon the testimony of the vocational expert to find that Plaintiff is able to perform work as a machine cleaner, equipment cleaner, and marker.  *See Robbins*, 466 F.3d at 886; *Martinez*, 807 F.2d at 774.

///

**D.    Harmless Error**

Even if the Court were to find the ALJ erred by not adopting the limitations assessed by Dr. Wagner related to Plaintiff's hearing loss and vertigo—and in rejecting Plaintiff's testimony regarding vertigo—the error was harmless.  The ALJ asked the vocational expert to consider an individual who had the additional limitations assessed by Dr. Wagner, by asking the expert to consider one who could "never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, crouch, kneel or crawl; avoid concentrated exposure to excessive vibration and to unprotected heights."  (*See* Doc. 10-3 at 52-53)  The vocational expert testified that a person with these restrictions was able to perform work as a marker, DOT 209.587-034, without any reduction in the number of jobs available.  (*Id.* at 53)

Further, Dr. Wagner opined that Plaintiff "should not work around excessive noise given [his] hearing loss."  (Doc. 10-8 at 53)  A claimant who must avoid "excessive noise" can perform work where the noise level is "moderate" or less.  *See, e.g., Smullen v. Colvin*, 2016 U.S. Dist. LEXIS 115379 at *12, 37 (N.D. In. Aug. 29, 2016) (finding the claimant who was precluded from exposure to "excessive noise levels to accommodate her hearing" was able to perform work in the national economy that involved "a moderate level of noise"); *Talbot v. Colvin*, 2015 U.S. Dist. LEXIS 122542 at *23 (N.D.N.Y. Sept. 15, 2015), citing SCODICOT, Appendix D- Environmental Conditions (finding the claimant with a restriction "to avoid excessive amounts of noise… could perform work at the moderate, quiet, and very quiet noise level, [and] would only be precluded from loud and very loud occupations").  Thus, if the limitation assessed by Dr. Wagner were adopted by the ALJ and this Court, Plaintiff would be precluded from performing work with a loud and very loud noise levels.

Importantly, review of the job description for marker under the *Dictionary of Occupational Titles* indicates that the noise level for the "marker" position is "moderate."  DOT 209.587-034, 1991 WL 671802.  Thus, the job would not be eliminated with the restriction from "excessive noise," and Plaintiff could work in that position *even if* all limitations identified by Dr. Wagner related to Plaintiff's hearing loss and vertigo were adopted, because the marker position does not require climbing, does not require balancing, and involves only moderate noise.  *See id.*

The vocational expert testified there were 24,282 positions for markers in the state of California, and 220,601 in the national economy.  (Doc. 10-3 at 20, 50)  The Ninth Circuit "has never clearly established the minimum number of jobs necessary to constitute a 'significant number.'"  *Barker v. Sec'y of Health & Human Servs*., 882 F.2d 1474, 1478 (9th Cir. 1989).  However, the Court found that when more than 1,000 jobs exist, this satisfies the requirement that there be a "significant number" of positions in the regional economy.  *See, e.g., Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (finding "a significant number of... jobs in the local area," where "there were between 1,000 and 1,500" regional positions); *Barker*, 882 F.2d at 1479 (finding 1,266 regional positions sufficient); *Thomas*, 278 F.3d at 959 (finding 1,300 regional positions satisfied the "significant number" requirement). Consequently, the jobs for markers are sufficiently numerous to support the conclusion at step five that Plaintiff is able to perform work in the local and national economy.

Because the ultimate conclusion of the ALJ—that Plaintiff can perform work existing in significant numbers—is not negated when adding the limitations assessed by Dr. Wagner, any such error was harmless.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (harmless error exists when the ALJ's error was inconsequential to the ultimate non-disability determination) (citations, quotations omitted); *see also Batson v. Comm'r of the Soc. Sec. Admin*., 359 F.3d 1190, 1197 (9th Cir. 2004) (finding the ALJ's error harmless where it did not negate the validity of the ultimate conclusion).

**<u>CONCLUSION AND ORDER</u>**

For the foregoing reasons, the Court finds the ALJ did not err in evaluating the record. However, even if the ALJ did err in assessing Plaintiff's RFC, any error was harmless because it does not negate the ultimate conclusion that Plaintiff is not disabled, and remains capable of performing work existing in significant numbers.  Therefore, the conclusion that Plaintiff is not disabled as defined by the Social Security act must be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

///

///

///

1      2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn

2              Colvin, Acting Commissioner of Social Security, and against Plaintiff Mark Gies.

3

4   IT IS SO ORDERED.

5      Dated:    **September 16, 2016**              **/s/ Jennifer L. Thurston**

6                                          UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28